UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

A.S., a minor, by and through　　　）
Next Friend, Chris Schaefer,　　　）
　　　　　　　　　　　　　　　）
　　　　　Plaintiff,　　　　　　　）
　　　　　　　　　　　　　　　）
　　　v.　　　　　　　　　　　　）　　　　Case No. 4:19 CV 91 CDP
　　　　　　　　　　　　　　　）
LINCOLN COUNTY R-III SCHOOL　）
DISTRICT, et al.,　　　　　　　　）
　　　　　　　　　　　　　　　）
　　　　　Defendants.　　　　　　）

## MEMORANDUM AND ORDER

Public high school student, A.S., engaged in off-campus speech on social

media that targeted a fellow student, and he encouraged other high school students

to perpetuate the speech.  Because this speech was directed to and reached the

school community and it was reasonably foreseeable that the speech would cause

substantial disruption in the school environment, the school did not violate A.S.'s

First Amendment right to free speech by imposing discipline for A.S.'s violation of

the school district's cyberbullying policy.  Nor did the school disciplinary hearing

violate A.S.'s Fourteenth Amendment right to due process.  I will therefore grant

defendants' motion for judgment on the pleadings on these constitutional claims.  I

will remand A.S.'s remaining state law claim to the Circuit Court of Lincoln

County, Missouri.

## Background

On a Saturday in October 2018, A.S. created a post on the social media platform Snapchat that included a doctored photograph depicting fellow student C.S. in a casket, words referring to C.S.'s funeral and visitation at a funeral home, and 'crying' and 'praying hands' emojis. A.S. shared this post with a limited group of classmates on Snapchat and encouraged them to post the meme to their own Snapchat stories, which they did. The following Monday at school, C.S. placed another student in a chokehold during class, upset about that student's comments about his death. After investigation, Assistant Principal Joy Lillard suspended A.S. for ten days for violating the school district's cyberbullying policy. The district's superintendent extended the suspension to the end of the semester. The school district's board of education held a hearing and upheld the extended suspension.

A.S. (through his next friend) brought this action in state court under 42 U.S.C. § 1983, alleging that defendants Lillard and the school district violated his First Amendment rights by suspending him for engaging in protected speech and, further, that the manner by which they conducted the discipline hearing denied him his Fourteenth Amendment right to due process.[1] A.S. also seeks judicial review of the school district's action under Missouri law. Defendants removed the matter

---

[1] Lillard is sued only in her individual capacity.

to this Court, invoking federal subject matter jurisdiction. They now move for

judgment on the pleadings on A.S.'s constitutional claims.[2]

## Legal Standard

When considering a motion for judgment on the pleadings under Federal

Rule of Civil Procedure 12(c), I must "accept as true all factual allegations set out

in the complaint, and must construe the complaint in the light most favorable to the

plaintiff, drawing all inferences in his favor." *Wishnatsky v. Rovner,* 433 F.3d 608,

610 (8th Cir. 2006). "Judgment on the pleadings is appropriate only when there is

no dispute as to any material facts and the moving party is entitled to judgment as a

matter of law[.]" *Ashley Cty., Ark. v. Pfizer, Inc.*, 552 F.3d 659, 665 (8th Cir.

2009) (internal quotation marks and citation omitted).

I review a motion for judgment on the pleadings under the same standard as

a Rule 12(b)(6) motion to dismiss. *See Clemons v. Crawford,* 585 F.3d 1119, 1124

(8th Cir. 2009). Therefore, I consider all facts alleged in the complaint as true to

determine if the complaint states a "claim to relief that is plausible on its face."

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009); *see also Braden v. Wal-Mart Stores,*

*Inc.,* 588 F.3d 585, 594 (8th Cir. 2009). "A claim has facial plausibility when the

plaintiff pleads factual content that allows the court to draw the reasonable

inference that the defendant is liable for the misconduct alleged." *Iqbal,* 556 U.S.

---

[2] A.S.'s state-law claim for judicial review is not a subject of defendants' motion.

at 678.  Although a complaint need not contain "detailed factual allegations," it must contain sufficient factual allegations "to raise a right to relief beyond the speculative level." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).

In addition to the complaint, I may consider exhibits that are attached to the complaint as well as materials necessarily embraced by the complaint, without having to convert the motion to one for summary judgment.  *Humphrey v. Eureka Gardens Pub. Facility Bd.*, 891 F.3d 1079, 1081 (8th Cir. 2018); *Ryan v. Ryan*, 889 F.3d 499, 505 (8th Cir. 2018).  Materials necessarily embraced by the complaint include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading."  *Ryan*, 889 F.3d at 505 (internal quotation marks and citations omitted). Upon review of the complaint here, I consider the administrative record consisting of the hearing transcript and evidence before the board of education, as well as the board of education's findings of fact and conclusions of law – both filed in this action by A.S. separately from his complaint – to be materials necessarily embraced by and consistent with the complaint.  Accordingly, on this motion for judgment on the pleadings, I consider these materials as well as the allegations in the complaint and the exhibit attached to the complaint.

## Evidence Before the Court on the Motion

<u>Conduct Giving Rise to the Complaint</u>

In October 2018, A.S. and C.S. were students enrolled at Troy Buchanan High School, which is a public school within the Lincoln County R-III School District. Joy Lillard was assistant principal at the school. Dr. Mark Penny was the school district's superintendent.

On Saturday, October 6, 2018, A.S. created a meme entitled "[C.]'s funeral."[3] The meme was a photograph of a casket with a photo of C.S. superimposed on it, positioned to make it appear as though C.S. was lying in the casket. Words superimposed above the casket stated, "please show up with only positive vibes"; and words superimposed beneath the casket stated, "at Kember-Millard-Keon Family Funeral Chapel." Emojis of a 'crying-face' and 'praying-hands' were also part of the meme. A.S. was not at school when he created the meme, nor was he at a school-sponsored event. A.S. did not use any school property to make the meme.

On that same day, October 6, A.S. posted the meme to a private Snapchat group made up of other Troy Buchanan High School students. A.S. encouraged the members of this private group to post the meme to their own Snapchat stories, which they did. Posting a meme to a Snapchat story causes the meme to circulate

---

[3] The meme's title actually stated C.S.'s first name in full.

outside any private Snapchat group and makes it available to all persons who "follow" the Snapchat user. Other students also created and posted memes about C.S. and his "death."

The date on which A.S. created, posted, and shared the funeral meme with other students, and encouraged these other students to publicly share the meme, was Troy Buchanan High School's homecoming.

On Monday, October 8, during the fourth class period at the high school, C.S. entered a classroom and put another student, L.P., into a chokehold. The teacher emailed Lillard and informed her of this incident, stating, "I thought he [C.S.] was joking but looked pretty upset. L. has been making comments saying that C. died apparently." (ECF 6-1.) The teacher also informed Lillard that "we have things under control" and that she did not write up the students, but she suggested that Lillard "have a conversation" with them. (*Id.*)

During her investigation into the incident, Lillard learned about the funeral meme and that A.S. had created it. When she talked to A.S. about it, he admitted to making the meme, posting it, and telling others to post it; but he stated that he never posted it publicly nor meant for it to become public. A.S. stated that other persons created additional memes of C.S. and that the group thought it would be funny to act as if C.S. was dead. A.S. memorialized these statements in a written statement. (Admin. Rec., ECF 4 at pp. 71-72.)

Lillard spoke to A.S. about the funeral meme on October 11. At that time, A.S. was serving an out-of-school suspension for posting a photo of a student's bare buttocks to a teacher's "remind app," a school-related homework site used by the teacher and accessed by students. That suspension was imposed October 1 and was set to expire November 13. A.S. was serving this suspension in the district's Academic Educational Program (AEP), which is a program located in a district building separate from the high school. Students participating in AEP receive daily instruction on coursework as well as lessons on positive behavior supports, and they receive full credit for coursework completed while in AEP. A.S.'s suspension for cyberbullying, which is at issue in this case, would not begin until he finished serving his suspension for the "remind app" incident.

On October 11, Lillard disciplined A.S. for cyberbullying and imposed a ten-day, out-of-school suspension. She also referred the matter to the superintendent of schools for consideration of extended suspension. In a letter dated October 12, Lillard informed A.S.'s parents that A.S. had been suspended for ten school days, effective October 11, and that the matter had been referred to the superintendent. In a letter dated October 19, Superintendent Penny notified A.S.'s parents of his decision to extend A.S.'s out-of-school suspension through the end of the semester.

In his October 19 letter to A.S.'s parents, Dr. Penny informed them of A.S.'s

right to have a hearing before the board of education for review of his decision.

Dr. Penny advised that, in the event of a hearing,

> the administration will provide you with a list of the witnesses who will testify on behalf of the administration, together with a short description of their testimony. Documents may also be used at the hearing. If documents are to be used, they will be provided to you prior to the hearing.

(ECF 4 at p. 149.) Dr. Penny also advised that A.S. or his representative could present witnesses and documentary evidence at the hearing.

A.S.'s parents determined to appeal the suspension, and a hearing before the board of education was scheduled for and held on November 6. On November 5, the school district's attorney provided A.S.'s attorney with copies of its exhibits and a list of its witnesses with summaries of their expected testimony.

Board of Education Hearing

Lillard and Dr. Penny testified at the hearing on November 6. A.S. and his father also testified and were represented by counsel. Documentary evidence was also admitted at the hearing.

Lillard testified to the following regarding her investigations into the chokehold incident and funeral meme:

When Lillard spoke with C.S. on October 8 regarding the chokehold incident, he told her that A.S. and his friends had bullied him for over a year, that this group made memes of him, that a meme about his funeral had been created

and circulated on social media, and that fellow students were making comments to him about being dead. The meme was created and circulated on homecoming Saturday, and people reached out to C.S. asking if he was okay because they heard he was dead. C.S. told Lillard that the football team held a moment of silence for him during the football game and that, at the homecoming dance, people made comments to him about being a ghost. C.S. told Lillard that he could not take it anymore and he "snapped," which led to his altercation with L.P. on October 8.

At Lillard's request, C.S. sent her the funeral meme as well as other memes targeting him. The funeral meme and several copies of its reposting, as well as the other memes, were admitted as exhibits at the board hearing.

Lillard also testified that she learned that two students approached teachers during class on October 8 and expressed concern about C.S. The students also stated that they would not want to be the target of similar bullying behavior. Another student expressed concern directly to Lillard and reported that the funeral meme was being shown in class and that students were talking about it. Two students were worried that C.S. would hurt himself. Lillard testified that she had written statements from these students, but they were not produced at the hearing.

Lillard testified that she spoke to C.S.'s mother regarding the "whole situation" and offered counseling for C.S., either at school or through another arrangement. C.S.'s mother told Lillard that C.S. was already seeking help for

depression and that this episode caused more distress than he could handle.

Lillard testified that, based on her investigation, she determined that by his conduct, A.S. violated the district's cyberbullying policy. That policy states:

> Bullying is the intentional action by an individual or group of individuals to inflict intimidation, unwanted aggressive behavior, or harassment that is repetitive or is substantially likely to be repeated and causes a reasonable student to fear for his or her physical safety or property; substantially interferes with the educational performance, opportunities, or benefits of any student without exception; or substantially disrupts the orderly operation of the school. . . .

> Cyberbullying means bullying as defined above through the transmission of a communication including, but not limited to, a message, text, sound, or image by means of an electronic device including, but not limited to, a telephone, wireless telephone, or other wireless communication device, computer, or pager. The District may prohibit and discipline for cyberbullying that originates on any District campus or at a District activity if the electronic communication was made using the school's technological resources, if there is a sufficient nexus to the educational environment, or if the electronic communication made on the District's campus or at a District activity using the student's own personal technological resources. Further, students who engage in significant acts of misconduct off-campus, which materially and adversely impact the education of District students will be subject to discipline.

(ECF 4 at pp. 110-11.) Lillard also testified to the district's policy regarding off-campus behavior, which states that "the School District reserves the right to impose disciplinary consequences for any student's conduct (whenever and wherever it may occur) if such conduct is prejudicial to good order and discipline in the schools or tends to impair the morale or good conduct of the pupils." (*Id.* at p. 124.)

Dr. Penny testified that he determined that A.S.'s conduct was prejudicial to good order and discipline in the school and disrupted the learning environment at the school given that students actually thought C.S. was dead and they reached out to see if C.S. was okay; that students shared the meme and talked about it at school; that staff notified school administrators of the situation; and that it ultimately led to a physical altercation in a classroom involving C.S. Dr. Penny testified that this was not a "typical situation." He also testified to his understanding that school discipline can be imposed if off-campus misconduct comes into the school and creates a disruption of the academic learning environment.

A.S. testified that it was not his idea to start a joke about C.S. being dead. He admitted that he created the funeral meme for his Snapchat group and told other students to post it, but he did not think people would take it seriously since the picture was "obviously fake." He was at home when he made and posted the meme. He did not know that C.S. saw the meme until Lillard talked to him about it on October 11. He testified that he and C.S. were "somewhat friends" before this happened.

Finally, A.S.'s father testified that Lillard called him and told him about the funeral meme and A.S.'s role. Lillard did not tell A.S.'s father that there had been any disruption at school, nor did she talk about possible suspension. A.S.'s father

testified that he then received a letter from Lillard setting out the ten-day suspension, and later received Dr. Penny's letter setting out the extended suspension. He had had no discussion with any school officials between the time he received Lillard's letter and his receipt of Dr. Penny's letter.

Board's Findings of Fact and Conclusions of Law

On November 30, the board issued its findings of fact and conclusions of law.[4] It found the school administrators to be credible and gave appropriate weight to their testimony. Upon consideration of the evidence and testimony, the board found:

> [A.S.]'s meme was targeted to bullying a particular student and his death. After [A.S.] created the meme, he spread it and encouraged others [sic] students to publish it and it ultimately went viral. It was expected to and it did cause a material and substantial disruption, and invaded the right of C.S. to be secure, left alone, and to access the full opportunities of the District without being bullied. Students accessed and showed the meme in class. A fight ensued by C.S. Classes were disrupted and different students approached different teachers because of their concern about the cyberbullying and its impact on C.S.'s mental health. The meme impacted the school environment and caused a considerable disturbance and disruption.

(ECF 19 at p. 9.) The board determined that these facts showed that A.S. engaged in cyberbullying in violation of district policy and that such conduct was prejudicial to good order and discipline in the school and tended to impair the

---

[4] According to the complaint, the board transmitted its decision to A.S. on November 7 but did not issue its written findings and conclusions until November 30.

- 12 -

morale and good conduct of the students of the district. The board unanimously upheld the extended suspension. (*Id.* at p. 10.)

Judicial Action

A.S. filed this action in the Circuit Court of Lincoln County, Missouri, on December 7, 2018. Defendants removed the action to this Court on January 23, 2019.

In Count I of his complaint, A.S. seeks judicial review of the board of education's decision by trial *de novo* as provided under Mo. Rev. Stat. § 167.161.3. In Count II, A.S. seeks relief from Lillard and the school district for First Amendment violations. In Count III, A.S. claims that the manner by which Lillard and the board conducted the November 6 hearing violated his rights under the Fourteenth Amendment, and specifically, that he was deprived of his interest in public education and in his reputation without due process, and of his right to be free from arbitrary and capricious punishment. A.S. seeks monetary damages and equitable relief in the form of expungement of this event from his education records.

Defendants move for judgment on the pleadings under Rule 12(c) on A.S.'s constitutional claims, arguing that A.S.'s speech that gave rise to disciplinary action was not protected by the First Amendment and, further, that A.S. was provided all the process he was due. Defendant Lillard also contends that she is

entitled to qualified immunity on A.S.'s constitutional claims.

## Discussion

A.    <u>First Amendment Free Speech</u>

While it is well established that students do not "shed their constitutional rights to freedom of speech or expression at the schoolhouse gate," *Tinker v. Des Moines Indep. Cmty. Sch. Dist.,* 393 U.S. 503, 506 (1969), the First Amendment does not protect all speech in the school environment, and school officials may lawfully punish some forms of unprotected student speech. *S.J.W. ex rel. Wilson v. Lee's Summit R-7 Sch. Dist.*, 696 F.3d 771, 776 (8th Cir. 2012).  "[C]onduct by the student, in class or out of it, which for any reason – whether it stems from time, place, or type of behavior – materially disrupts classwork or involves substantial disorder or invasion of the rights of others is . . . not immunized by the constitutional guarantee of freedom of speech." *Tinker*, 393 U.S. at 513; *see also S.J.W.*, 696 F.3d at 776-77.  "Thus, student speech that causes a substantial disruption is not protected." *S.J.W.*, 696 F.3d at 777.

*Tinker* applies to off-campus student speech where it is "reasonably foreseeable that the speech will reach the school community and cause a substantial disruption to the educational setting." *S.J.W.*, 696 F.3d at 777 (citing *D.J.M. ex rel. D.M. v. Hannibal Pub. Sch. Dist. # 60*, 647 F.3d 754, 766 (8th Cir. 2011)).  Speech which "actually causes" a substantial disruption to the educational

environment is not protected by the First Amendment. *Id.* at 778.

Here, A.S. was off campus when he created the funeral meme, posted it to social media, circulated it to fellow students and encouraged them to circulate the meme publicly on social media. But because it was reasonably foreseeable that this speech would (and indeed did) reach the school community and cause a substantial disruption to the educational setting, it is not protected speech under the First Amendment.

First, A.S.'s funeral meme was purposely designed to reach the high school community given that it targeted a specific student at the high school and was specifically, deliberately, and purposefully shared with other high school students on social media, with A.S.'s encouragement that these other students post the meme to their public Snapchat stories. *See Kowalski v. Berkeley Cty. Sch.*, 652 F.3d 565, 574 (4th Cir. 2011) ("To be sure, it was foreseeable in this case that Kowalski's conduct would reach the school via computers, smartphones, and other electronic devices, given that most of the 'S.A.S.H.' group's members and the target of the group's harassment were Musselman High School students.). The timing of A.S.'s speech is significant, too, given that he created and circulated the meme and encouraged its dissemination the same day as homecoming – a highly social and school-centric event involving several high school students and an increased level of communication among students. Given C.S.'s reaction at school

the following Monday as well as the other students' expressed concerns regarding the meme and its effect, not only was it reasonably foreseeable that the meme would reach the school community, it actually did.

It was also reasonably foreseeable that A.S.'s meme would cause substantial disruption to the educational setting. The test is an objective one, focusing on the reasonableness of the school administration's response, not on the intent of the student. *See Cuff ex rel. B.C. v. Valley Cent. Sch. Dist.*, 677 F.3d 109, 113 (2d Cir. 2012) (citing cases, including *Tinker,* 393 U.S. at 514). A.S.'s after-the-fact characterization that the meme was meant to be a joke is therefore irrelevant.

To be "substantial," the disruption to the school environment must be more than a mild distraction or curiosity. *See J.C. ex rel. R.C. v. Beverly Hills Unified Sch. Dist.*, 711 F. Supp. 2d 1094, 1117 (C.D. Cal. 2010). A general "buzz" about the challenged speech does not rise to the level of substantial disruption. *Id.* (citing *Tinker*, 393 U.S. at 514). And absent evidence of a prior occurrence or of a prior relationship that would support a prediction of an adverse occurrence, mere speculation that a disruption may occur is not sufficient to reasonably forecast that the disruption may be substantial. *Id.* Relevant to the consideration, however, is the offending student's disciplinary history and other students' reaction to the speech. *See Cuff*, 677 F.3d at 113.

Here, it was reasonably foreseeable to a school administrator that A.S.'s

funeral meme would cause a substantial disruption to the educational setting and that failure to impose discipline for the meme would perpetuate that disruption. First, C.S. suffered from depression for which he received outside help. He had been bullied by A.S. and his group of friends for over a year and was now facing a virtual and unrestrained "joke" about – of all things – his death. He knew that this "joke" was circulating among his peers at school, and fellow students directed comments to him about being dead – not only at school but at the homecoming dance as well. It was reasonably foreseeable that C.S. would lash out at his antagonists in the school environment since that is where the offending conduct was directed and where he experienced it.

Moreover, given "consistent and well-publicized reports" of self-harm tragedies that result from bullying at school, school administrators are on notice that doing nothing to prevent known bullying of a student may lead that student to self-harm, even suicide. *See Estate of Olsen v. Fairfield City Sch. Dist. Bd. of Educ.*, 341 F. Supp. 3d 793, 811 (S.D. Ohio 2018) (citing *Tumminello v. Father Ryan High Sch., Inc.*, 678 F. App'x 281, 288 (6th Cir.), *cert. denied*, 138 S. Ct. 121 (2017)). Indeed, two students at Troy Buchanan expressed concern to teachers or school administrators that C.S. may engage in self-harm because of the meme. Notably, the reasonable foreseeability test focuses on the *risk* of disruption; a school need not wait for an actual disturbance or a tragic occurrence before it may

act.  *See Lowery v. Euverard*, 497 F.3d 584, 596 (6th Cir. 2007).

In *Kowalski*, the Fourth Circuit articulated the well-documented effect bullying has on the school environment:

> According to a federal government initiative, student-on-student bullying is a "major concern" in schools across the country and can cause victims to become depressed and anxious, to be afraid to go to school, and to have thoughts of suicide.  *See* StopBullying.gov, available at www.stopbullying.gov (follow "Recognize the Warning Signs" hyperlink).  Just as schools have a responsibility to provide a safe environment for students free from messages advocating illegal drug use, *see Morse* [*v. Frederick*], 551 U.S. 393 [2007], schools have a duty to protect their students from harassment and bullying in the school environment, *cf. Lowery v. Euverard*,497 F.3d 584, 596 (6th Cir. 2007) ("School officials have an affirmative duty to not only ameliorate the harmful effects of disruptions, but to prevent them from happening in the first place").  Far from being a situation where school authorities "suppress speech on political and social issues based on disagreement with the viewpoint expressed," *Morse,* 551 U.S. at 423 (Alito, J., concurring), school administrators must be able to prevent and punish harassment and bullying in order to provide a safe school environment conducive to learning.

652 F.3d 565, 572 (4th Cir. 2011) (parallel citations omitted).  As was recognized in *Estate of Olsen*, school administrators that fail to investigate and impose discipline on known cyberbullying may face liability for a bullying victim's suicide.  341 F. Supp. 3d at 800.  "This is because the 'decision not to enforce rules against bullying or punishments for bullying [give] students license to act with impunity.'"  *Id.* at 803 (quoting *Shively v. Green Local Sch. Dist. Bd. of Educ.*, 579 F. App'x 348, 356 (6th Cir. 2014)).

Here, when Lillard imposed discipline and when the board upheld the

extended suspension, they knew that A.S. had bullied C.S. for over a year before the funeral meme incident occurred. They also knew that C.S. suffered from depression. They knew that A.S.'s most recent targeting of C.S. involved C.S.'s death and that A.S. encouraged other students to disseminate this self-described "joke" publicly on social media. They knew that students were making comments to C.S. about being dead. They knew that A.S.'s meme was the original impetus to other students' conduct that caused C.S. to snap and have more distress than he could handle. They knew that the meme caused more than just a "buzz" around school – it was being shared in the classroom during school hours, was the source of other students' articulated concerns regarding C.S.'s well-being as well as their own, and caused a physical altercation between students in class. Finally, they knew that at the time A.S. created and posted the funeral meme, he was already serving a suspension for cyber-related misconduct directed at the school environment.

Given this knowledge that A.S. was again engaging in disturbing cyber conduct purposely directed at the school community, was targeting a fellow student whom he had been bullying for over a year, and had recruited fellow students to join in, it was reasonably foreseeable that, if left unchecked, A.S. would continue to target C.S. and/or the school environment and encourage other students to engage in similar conduct, thus leading to substantial disruption. The

reasonableness of this forecast is shown here by C.S.'s reaction and by the other students' articulated concerns – not only for C.S., but for themselves as potential victims of cyberbullying. *Cf. Cuff*, 677 F.3d at 113 (offending student's disciplinary history and other students' reaction to the speech relevant to foreseeability); *J.C.*, 711 F. Supp. 2d at 1117 (prior relationship could support prediction of an adverse occurrence).

Moreover, actual disruption occurred in the school setting on account of the meme. C.S. entered a classroom during a class period and placed another student in a chokehold, which was observed by the teacher to be "serious." Other students talked to their respective teachers during their class periods regarding their concerns for C.S.'s well-being and their own. While a student's hurt feelings in general are insufficient to constitute a substantial disruption in the school community, a physical altercation or classroom discussion may suffice. *See J.C.*, 711 F. Supp. 2d at 1117; *see also Cuff*, 677 F.3d at 113 (speech caused substantial disruption where students brought matter to teachers' attention and were "very worried" about the speech). Here, we have both.

Accordingly, although A.S.'s funeral meme was created off school grounds, it was purposefully designed to bully and harass another student by generating chatter among other students at the high school at A.S.'s invitation and encouragement. Not only did it cause an actual disruption at the school, but it was

reasonably foreseeable to school administrators that, if left unchecked, it would create a substantial disruption given the tangible effect it already had on the targeted student, who suffered from depression, as well as the school community – not only the students who expressed concern to teachers and administrators about C.S., but also the students who continued to tease and make comments to C.S. about his death.  This speech was therefore not protected by the First Amendment, and Lillard and the school district were authorized to discipline A.S. for this speech.

Citing *R.S. ex rel. S.S. v. Minnewaska Area Sch. Dist. No. 2149*, 894 F. Supp. 2d 1128 (D. Minn. 2012), A.S. repeatedly contends that in order to constitute unprotected speech under *Tinker*, the off-campus statements must not only be reasonably calculated to reach the school environment, but they must also be "so egregious" as to pose substantial disruption in that environment.  (ECF 23 at pp. 5, 7, 16, 18, 20.)  A.S. argues that his funeral meme was not "so egregious" to justify its exclusion as protected speech under the First Amendment.  Other than the District of Minnesota's characterization, I have not found any authority narrowing the *Tinker* analysis to require that off-campus speech reach a certain level of "egregiousness" to warrant school discipline.  Indeed, as recognized by the Western District of Arkansas,

> While it is true that many of the cases in this area of the law involve
> students whose conduct was more egregious, the metric used to assess

a district's punishment of off-campus speech is not how egregious the speech was, but rather whether it either caused a substantial disruption to the school environment or whether school officials could reasonably have forecast such a disruption.

*McKinney as Next Friend of K.P. v. Huntsville Sch. Dist.*, 350 F. Supp. 3d 757, 768 (W.D. Ark. 2018). I agree with the court in *McKinney* and will not alter the *Tinker* analysis to mandate that the speech at issue meet a certain level of egregiousness in itself in order for a student's off-campus speech to be properly and lawfully subject to school discipline.

Because A.S.'s funeral meme was not protected speech in the circumstances of this case, neither Lillard nor the school district violated A.S.'s First Amendment right to free speech when they disciplined him for engaging in such speech.

B.   Fourteenth Amendment Due Process

In his Fourteenth Amendment claim, A.S. contends that the manner by which Lillard and the board of education conducted the discipline hearing denied him due process because they presented and relied on: 1) untrue testimony without corroboration, 2) material evidence that did not exist or was not produced, and 3) inflammatory and irrelevant exhibits. A.S. claims that, as a result, the board's final decision to uphold his suspension was a mere ratification of the superintendent's earlier decision, thereby depriving him of his interest in public education and in his reputation without due process, and of his right to be free from arbitrary and capricious punishment.

As an initial matter, I disagree with defendants' assertion that A.S.'s placement and participation in AEP precludes his claim that he was deprived of his interest in a public education. "The intangible benefits of attending public school have long been recognized and protected by the federal courts." *Engele v. Independent Sch. Dist. No. 91*, 846 F. Supp. 760, 765 (D. Minn. 1994) (citing *Brown v. Board of Educ.*, 347 U.S. 483, 493 (1954)). Because suspension from school "is a serious event in the life of the suspended child," the property interest in educational benefits and the liberty interest in reputation are implicated. *Goss v. Lopez*, 419 U.S. 565, 576 (1975). In this case, although A.S.'s participation in AEP perhaps minimized some of the effects of his suspension, it does not affect my determination that he was entitled to the basic right of due process. *Engele*, 846 F. Supp. at 765 (severity of deprivation is not decisive of student's basic right to due process); *see also S.W. by & through Walsh v. Rockwood R-VI Sch. Dist.*, No. 4:17-CV-01483-NCC, 2017 WL 5903984, at *6 (E.D. Mo. Nov. 30, 2017).

Students facing a ten-day suspension must be given some kind of notice and afforded some type of hearing. *Goss*, 419 U.S. at 579. To satisfy due process in such a circumstance, the hearing can be informal and can be held immediately following the incident. "Longer suspensions or expulsions for the remainder of the school term, or permanently, may require more formal procedures." *Id.* at 584.

Constitutionally, due process requires that individuals have "notice and

opportunity for a hearing appropriate to the nature of the case" prior to a deprivation of life, liberty, or property. *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Notice must be "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 314. In the context of school disciplinary proceedings resulting in suspension, Missouri law requires that the student be given oral or written notice of the charges against him/her; that, if the student denies the charges, the student be given an oral or written explanation of the facts which form the basis of the proposed suspension; that the student be given an opportunity to present his/her version of the incident; and, in the event of a suspension imposed by the superintendent for more than ten school days, the student, the student's parents, or others having custodial care may appeal the decision of the superintendent to the board of education, whereupon the board is required to consider the evidence and statements that the parties present as well as records of past disciplinary actions. Mo. Rev. Stat. §§ 167.161, 167.171. A.S. does not challenge this process.

A.S.'s Fourteenth Amendment claim challenges only the hearing held by the board of education on November 6. Notably, he does not allege that he was denied any notice with regard to this hearing, or that he was denied the opportunity to raise any challenges or be heard. Instead, he challenges only the quality of the

evidence presented to the board, alleging that it was untrue, incomplete, and irrelevant. The Supreme Court has stated, however, that "§ 1983 does not extend the right to relitigate in federal court evidentiary questions arising in school disciplinary proceedings[.]" *Wood v. Strickland*, 420 U.S. 308, 326 (1975), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800 (1982). And, as recognized by this Court, "courts have consistently declined to impose the formal procedures and rules of evidence which govern court trials on student disciplinary proceedings." *Sykes v. Sweeney*, 638 F. Supp. 274, 279 (E.D. Mo. 1986). In a §1983 claim such as that presented by Count III, "It is not the purpose of this Court to step in and rehear the evidence and rethink the decision of school board officials." *Id.*

Here, A.S. was afforded all the process he was due in relation to the November 6 hearing. He was represented by counsel before the board; he was offered the opportunity to confront school officials having knowledge of the relevant facts; he was allowed to cross-examine the witnesses and challenge the exhibits submitted; and he was offered the opportunity to present evidence in support of his case. Having been afforded notice of the time and place of the hearing, permitted an opportunity to be heard, the right to counsel, and the right to confront the school officials having knowledge of the relevant facts, A.S. was afforded his due process. *Sykes*, 638 F. Supp. at 278; *see also Mardis v. Hannibal*

*Pub. Sch. Dist. # 60*, No. 2:08CV63 JCH, 2009 WL 1140037, at *5 (E.D. Mo. Apr. 28, 2009).  To the extent A.S. challenges the evidence upon which the board relied in making its decision, federal court considering a § 1983 claim is not the place to relitigate evidentiary questions that arise in school disciplinary proceedings. *Wood*, 420 U.S. at 326.

Nor is Lillard liable as a witness.  Due process requires an impartial decisionmaker.  *See Withrow v. Larkin,* 421 U.S. 35, 47 (1975) ("a biased decisionmaker [is] constitutionally unacceptable"); *Jennings v. Wentzville R-IV Sch. Dist.*, 397 F.3d 1118, 1124-25 (8th Cir. 2005).  A.S. does not allege that Lillard was a decisionmaker in the board's final decision to uphold A.S.'s extended suspension, nor do the reviewed materials show that she was.  I am not aware of any authority, and A.S. cites to none, that imposes due process liability on a non-decisionmaker who testifies at a school disciplinary hearing, even if it alleged that the testimony was untruthful.

A.S.'s procedural due process claim fails.

After providing A.S. the procedural due process outlined above, the board of education upheld the extended suspension based on evidence adduced at the hearing that:  1) A.S. was already placed on out-of-school suspension for cyber-related misconduct directed to the school; 2) A.S. admitted to creating, posting, and encouraging students to share a meme on social media that targeted a

particular student and made fun of his purported "death"; 3) students accessed and showed the meme in class; 4) the targeted student engaged in a fight at school because of comments about his "death"; 5) different students approached different teachers because of their concern about the cyberbullying and its impact on the targeted student's mental health; and 6) classes were disrupted. Against the backdrop of this evidence, the board's imposition of an extended suspension that amounted to twenty-three school days is not "'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience' of federal judges." *Keefe v. Adams*, 840 F.3d 523, 533 (8th Cir. 2016) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 847 n.8 (1998)). Nor can it be said that "there was no rational basis for the [school's] decision or that the decision was motivated by bad faith or ill will." *Disesa v. St. Louis Cmty. Coll.,* 79 F.3d 92, 95 (8th Cir.1996).

Because the circumstances here do not present a "truly egregious [or] extraordinary case[,]" A.S.'s substantive due process claim fails. *Novotony v. Tripp Cty., S.D.*, 664 F.3d 1173, 1178 (8th Cir. 2011) (internal quotation marks and citation omitted).

C.    Qualified Immunity

Lillard asserts that she is entitled to qualified immunity on A.S.'s constitutional claims.

In actions brought under 42 U.S.C. § 1983, qualified immunity protects state

officials from suit for money damages "unless (1) the evidence, viewed in the light most favorable to the nonmoving party, establishes a violation of a federal constitutional or statutory right, and (2) the right was clearly established at the time of the violation." *Robinson v. Payton*, 791 F.3d 824, 828 (8th Cir. 2015). As discussed above, the evidence fails to establish a violation of A.S.'s First Amendment right to free speech or Fourteenth Amendment right to due process. On this basis alone, Lillard is entitled to qualified immunity on these claims. Nevertheless, it cannot be said that the rights asserted by A.S. in this action were clearly established at the time they were allegedly violated. Accordingly, Lillard is entitled to qualified immunity on this basis as well.

In order to be "clearly established," a right's contours must have been "sufficiently definite that any reasonable official in the defendant's shoes would have understood that [she] was violating it." *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014). Preexisting law must make the unlawfulness of the official's conduct apparent so that she has "fair and clear warning" she is violating the Constitution. *White v. Pauly*, 137 S. Ct. 548, 551-52 (2017) (per curiam). "We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). Qualified immunity therefore protects "all but the plainly incompetent or those who knowingly violate the law." *White*, 137 S. Ct. at 552. Because qualified

immunity protects officials who make bad guesses in gray areas, *Littrell v. Franklin*, 388 F.3d 578, 582 (8th Cir. 2004), it gives them breathing room to make reasonable but mistaken judgments.  *Blazek v. City of Iowa City*, 761 F.3d 920, 922 (8th Cir. 2014).

*First Amendment Free Speech*

The law is clearly established that students have First Amendment rights both on and off the school campus.  But the law is not so clearly established regarding the degree of foreseeability or disruption to the school environment that must be shown under *Tinker* in order for school officials to limit a student's off-campus speech.  *See D.J.M.*, 647 F.3d at 766-67.  Courts continue to face this difficult issue in protecting First Amendment values while being sensitive to a school administrator's need for a secure school environment.  *See id*.  Given the uncertainty in this area of the law, I cannot conclude that any reasonable school administrator would have understood that she was violating a student's right to free speech by imposing punishment in the circumstances of this case.  "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines."  *Scott v. Baldwin*, 720 F.3d 1034, 1036 (8th Cir. 2013) (quoting *Davis v. Hall*, 375 F.3d 703, 712 (8th Cir. 2004)).  Lillard is therefore entitled to qualified immunity on A.S.'s First Amendment claim.

*Fourteenth Amendment Due Process*

As discussed above, the law is clearly established that due process requires an impartial decisionmaker. But the law is not so clearly established as to what process is due from a non-decisionmaker witness at a school disciplinary hearing. Indeed, I am aware of no existing precedent that places this constitutional question beyond debate, and A.S. cites to none. Although A.S. contends that Lillard's testimony at the hearing was evasive, embellished, incredible, and untrue, he nevertheless had the opportunity to cross-examine Lillard and to present evidence, testimony, and argument on his own behalf. Accordingly, regardless of Lillard's alleged conduct as a witness, A.S. was afforded all the process he was due. Whether the board improvidently found Lillard credible is not a matter for me to decide. *Wood*, 420 U.S. at 326.

### Supplemental Jurisdiction

In Count I of his complaint, A.S. seeks judicial review of the board of education's decision under Mo. Rev. Stat. § 167.161. Under § 167.161.3, A.S. is entitled to judicial review of the board's decision by way of "a trial *de novo* by the circuit court." Because I will dismiss all claims over which this Court has original jurisdiction, I decline to exercise supplemental jurisdiction over this state law claim and will remand the matter to the Circuit Court of Lincoln County for an appropriate trial *de novo* as provided by Missouri law. 28 U.S.C. § 1367(c)(3). *See also D.J.M.*, 647 F.3d at 767 (district court did not abuse its discretion in

remanding to state court plaintiff's state-law claim for review of school's disciplinary decision), *affirming Mardis v. Hannibal Pub. Sch. Dist. # 60*, 684 F. Supp. 2d 1114 (E.D. Mo. 2010).

Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion for Judgment on the Pleadings on Counts II and III of Plaintiff's Complaint [21] is **GRANTED.**

**IT IS FURTHER ORDERED** that defendants Joy Lillard and the Lincoln County R-III School District shall have judgment against plaintiff A.S. on Counts II and III of A.S.'s complaint.

**IT IS FURTHER ORDERED** that A.S.'s claim for judicial review under Mo. Rev. Stat. § 167.161 (Count I) is **REMANDED** to the Circuit Court of Lincoln County, Missouri.

An appropriate Judgment and Order of Remand is entered herewith.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 17th day of December, 2019.